IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TOMMY ROBINSON, #226-992       *

   Plaintiff,                    *

       v.                       *       Civil Action No. DKC-17-535

NURSE KIMBERLY MARTIN,         *
WEXFORD HEALTH SOURCES, INC.,
and COLLEGIAL MEDICAL GROUP,   *

   Defendants.                   *
                               **********

**MEMORANDUM OPINION**

**I. Procedural History**

Plaintiff Tommy Robinson, a Maryland Division of Corrections' prisoner confined at the Western Correctional Institution in Cumberland (WCI), is no stranger to the litigation process, having filed dozens of actions both here and in the Maryland district and circuit courts over the past two decades.[1] In this action, removed from the Circuit Court for Allegany County, Robinson seeks compensatory and punitive damages as well as injunctive relief[2] for allegedly untreated medical conditions.

---

[1] At least eight of his federal civil rights actions involved claims against prison health care providers. *See Robinson v. Prison Health,* No. AW-95-3449 (D.Md. Sept. 26, 1996); *Robinson v. Prison Health*, No. AMD-96-170 (D.Md. Oct. 7, 1998); *Robinson v. E.M.S.A. Corr. Care*, No. AMD-97-3524 (D.Md. Oct. 18, 1998); *Robinson v. Adegboyegg-Panox,* No. AMD-00-727 (D.Md. May 9, 2001); *Robinson v. Ayalew,* No. AMD-00-3101 (D.Md. Feb. 23, 2001); *Robinson v. Med. Staff MHC-X*, No. AMD-03-2863 (D.Md. Dec. 2, 2003); *Robinson v. Med. Staff c/o Prison Health Servs.,* No. AMD-03-3166 (D.Md. Nov. 7, 2003); and *Robinson v. W. Md. Health Sys., Inc.*, DKC-10-3223, 2011 WL 2713462 (D.Md. July 8, 2011).

[2] Robinson seeks demotion of Defendant Martin as "head nurse," as well as renewal of daily "medical ice" and feed-in status. He asks this court to declare that Collegial's prior failures to approve his referrals to outside specialists for an operation to his blocked colon be declared an Eighth Amendment violation (ECF No. 2, at 14), and that he receive money damages for said failure to approve outside treatment (*id.* at 15-16). He also requests generally that he be

The unverified complaint encompasses claims arising under state tort law governing negligence as well as Eighth Amendment claims under the federal Civil Rights Act, 42 U.S.C. § 1983. Robinson names as Defendants Nurse Kimberly Martin and her employer, Wexford Health Sources, Inc. ("Wexford").[3] Defendants have filed a dispositive motion to dismiss or, in the alternative, motion for summary judgment (ECF No. 19), and Robinson has filed an opposition (ECF No. 37) and a cross-motion for summary judgment (ECF No. 52).[4] Both dispositive motions may be decided without a hearing. *See* Local Rule 105.6.[5] For reasons set

---

transported to an outside hospital for treatment of injuries (*id.* at 15), although he does not specify that this treatment necessarily includes a colon operation. He also seeks an "MRI to his entire body" and "a Barium enema test." He further requests copies of all tests and medical records, without cost. (ECF No. 2, at 14-17). For reasons noted herein, injunctive relief is denied. Robinson may formally request his records in accordance with DPSCS policy. *See* Department of Public Safety and Correctional Services, *Clinic Services & Inmate Health*, Operations Manual. He may wish to contact his case manager for information on initiating a medical records request.

[3] Robinson also names "Collegial Medical Group." This entity does not exist and will be dismissed. As explained by Dr. Robustiano Barrera, M.D., Wexford's Medical Director at WCI, (ECF No. 19-5 ¶ 1) patients for whom specialty consultations are sought are placed on a list by the on-site primary medical providers for circulation to participants in the utilization review process. (*Id.* ¶16. A conference call is held with the Wexford utilization review physician and utilization review nurse. During the call, the primary care provider identifies the care sought and provides information in support of the request. Following presentation, (1) the care is approved; (2) an alternative treatment is proposed; (3) a decision is defers until more clinical information is available; or (4) the specialty service is denied as not medically indicated. (*Id.*).

The collegial process is not new. Wexford, working under contract with Maryland's Department of Public Safety and Correctional Services, developed the process nearly a decade ago to provide onsite utilization review management services to arrange offsite medical and clinical services, including hospitalizations and specialized medical and clinical services, to Maryland prisoners. *See* Motion to Dismiss, Exhibit 3, *Robinson v. W. Md. Health Sys., Inc.*, DKC-10-3223 (D.Md Feb. 4, 2011) (ECF No. 26-3).

[4] This Memorandum Opinion cites to pagination found in the court's electronic docket.

[5] For reasons apparent herein, Robinson's request for appointment of counsel, ( ECF No. 2, at 17), is denied, in accordance with *Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987) and

forth herein, Defendants' motion for summary judgment IS GRANTED and Robinson's cross-motion for summary judgment IS DENIED.

## II. Standard of Review

Because matters outside the pleadings are presented in the parties' dispositive motions, they are considered motions for summary judgment. Fed.R.Civ.P. 12(d). Summary judgment is governed by Fed.R.Civ.P. 56(a), which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court of the United States has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526.

---

*Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989).

**III.    Analysis**

**A.     Eighth Amendment Claim-Nurse Martin and other individuals**

To demonstrate a denial of his Eighth Amendment right to medical care, Robinson must prove two essential elements.  First, he must satisfy the objective component by illustrating a serious medical condition.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998).  If he proves this first element, Robinson must then prove the second subjective component of the Eighth Amendment standard by showing that health care personnel were deliberately indifferent to that serious medical condition.  *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06).  "[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference."  *Id*. at 837.  Medical staff are not liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  *Id*. at 844; *see Johnson*, 145 F.3d at 167.  "Further, when it appears from the entire record that the prison medical authorities have made a sincere and reasonable effort to handle plaintiff's medical problems, plaintiff's constitutional rights have not been violated pursuant to 42 U.S.C. § 1983."  *Robinson v. W. Md. Health Sys. Corp.*, DKC-10-3223, 2011 WL 2713462, *4 (D. Md. July 8, 2011) (internal quotation marks omitted).

Dr. Robustiano Barrera, M.D., Wexford's Medical Director at WCI since December of 2015, submitted an affidavit outlining the care provided to Robinson in general, and detailed Defendant Martin's role in the delivery of such care. In his affidavit, which is supported by the medical record, Barrera avers that Defendant Martin was not responsible for the discontinuation of Robinson's feed-in status, nor did she play a role with regard to the decision to end the practice of providing prisoners with "medical ice." (ECF No. 19-5 ¶¶ 5-6). The affidavit also refutes Robinson's allegation that Martin denied Robinson the use of a nebulizer on June 30, 2016. (*Id.* ¶¶ 10, 11).

Robinson has failed to substantiate the specific allegations he presented against Martin, and summary judgment in her favor is appropriate. The Court's inquiry, however, does not end there; given Robinson's self-represented status, examination of the medical record becomes necessary to determine whether other prison health care personnel have provided constitutionally adequate treatment of Robinson's multiple chronic health problems.

As gleaned from the medical records (ECF No. 19-4) and Dr. Barrera's affidavit (ECF No. 19-5), Robinson, who is in his late 60s, suffers from allergic rhinitis, hyperlipidemia (high cholesterol), hypertension, sleep apnea,[6] diabetes mellitus, benign prostatic hyperplasia (enlarged prostate), hearing loss, COPD, and asthma. (ECF No. 19-5 ¶ 4). He uses a wheelchair for distances over 25 feet because he is morbidly obese. Additionally, Robinson has irritable bowel

---

[6] Sleep apnea is a condition in which the airway becomes blocked or collapses during sleep, causing shallow breathing or pauses in breathing. A CPAP machine uses a mask that fits over the patient's mouth and/or nose. The machine gently blows air into the patient's throat. The air presses on the wall of the airway. The air pressure is adjusted so that it is enough to stop the airway from becoming narrowed or blocked during sleep. *See generally* National Heart, Lung, and Blood Institute, *Sleep Apnea*, https://www.nhlbi.nih.gov/health-topics/sleep-apnea (last reviewed January 25, 2018).

syndrome (IBS), which caused symptoms of diarrhea, constipation, abdominal pain and occasional incontinence. (*Id.*).

In addition to his specific complaints against Nurse Martin with regard to a feed-in order, medical ice, and use of a nebulizer, Robinson alleges that other unidentified health care personnel have denied him feed-in status, stopped his medical ice order without cause, failed to treat pneumonia he contracted in June of 2016,[7] refused to order a barium enema and operate on his blocked colon, refused to follow a recommendation for a repeat colonoscopy, have not provided surgery for his neck, and did not follow up on findings from a June 24, 2014, CT scan. (ECF No. 2, at 10-13). Barrera's affidavit, supported by the medical records (ECF No. 19-4), contradicts these allegations, and demonstrates that Robinson has received appropriate health care.

The following information concerning the specific complaints raised in this action appears in the medical records in chronological order.

**Feed-in Status**: On December 3, 2014, Dr. Barrera noted Robinson was incontinent and renewed his feed-in status. (ECF No. 19-4, at 1). On January 5, 2016, Robinson was seen by Dr. Barrera, who noted no medical need to continue him on feed-in status. (*Id.* at 11-13). On July 6, 2016, Robinson was seen by Beverly McLaughlin, R.N.P, and requested feed-in status. (*Id*. at 20). He reported his cold and COPD symptoms were improving. *Id*. His lungs were clear to auscultation and percussion. (*Id*).

On July 8, 2016, Dr. Barrera saw Robinson for a scheduled provider visit and submitted a consultation for a GI tele-med conference regarding Robinson's ongoing abdominal issues. (ECF No. 19-4, at 23-24).

---

[7] That another prisoner was sent to the hospital with pneumonia (ECF No. 37-1, at 7) does not support Robinson's argument that he, too, suffered the same illness.

On August 2, 2016, Robinson was seen by Janette Clark, N.P., and requested feed-in status due to bowel incontinence. (ECF No. 19-4, at 29-31). He was told to go to the kitchen for his meals.

Dr. Barrera's affidavit places the significance of the medical record in perspective. As noted in the affidavit (ECF No. 19-5 ¶ 5), Robinson had a medical order for feed-in status due to his incontinence, which Dr. Barrera had personally previously renewed.[8] By January 5, 2016, Barrera had evaluated Robinson and found he had good mobility in a wheelchair and had good control of urine and bowel movements, thus ending a need for feed-in status. On January 8, 2016, Barrera issued an order, co-signed by Nurse Martin, to discontinue Robinson's feed-in status. (*Id.*). Plaintiff has continued to raise the issue with medical personnel who have responded with other suggestions. His requests have not been ignored.

**Medical Ice:** Barrera confirms Robinson's assertion that it had become common practice to issue long-term medical orders for ice to inmates. However, this practice was being abused by some prisoners who were using the medical orders to obtain a continuous supply of ice to place in their sinks, over which they directed a fan, to provide a form of "air-conditioning." In the fall of 2015, medical providers determined that medical orders for ice should be limited to 2-3 days in duration, and only for specific conditions that warranted such an order. Otherwise, prisoners could obtain ice from the ice machines on their housing tier. Barrera opines that Robinson's shortness of breath caused by COPD would not be relieved by the application of ice, although he could receive short-term relief applying ice for his neck pain. Barrera notes Robinson's long-term symptoms of neck pain are related to a small disc protrusion at C5-C6, for which a medical order for ice is not indicated. (ECF No. 19-5 ¶ 7).

---

[8] Robinson states that on December 21, 2015, he had been given feed-in status for six months by Dr. Monica Stallworth. (ECF No. 37, at 3); (*see* ECF No. 37-3, at 7).

The records show that, on June 10, 2015, Plaintiff requested medical ice for joint pain, but was told that an ice prescription could not be given. (ECF No. 19-4 at 3-4. Again on September 28, 2015, Robinson requested a medical ice order for neck, back, and knee pain from Dennis Martin, R.N. (*Id*. at 5). He again was told medical ice orders were no longer being written and he should seek ice on his housing unit tier. (*Id*.). Undeterred, he requested medical ice for delivery at 5:00 p.m., rather than 9:00 p.m., on November 19, 2015, from Beverly McLaughlin, R.N.P. (*Id.* at 7-8). On November 25, 2015, Robinson again requested a medical ice order from Carla Buck, R.N., and when she refused became argumentative, demanded different pain medications. (*Id.* at 9). On July 18, 2016, Robinson requested an ice order and feed-in status order from Dennis Martin, R.N. (*Id*. at 25-26). He was told that ice was available on his housing unit tier. (*Id*). On July 28, 2016, Robinson told Keri Davis, R.N., that he previously had been ordered feed-in status and medical ice and wanted the orders renewed. (*Id*. at 27-28). He was referred to a provider.

On August 2, 2016, he also requested medical ice which he claimed he had used for 12 years, complaining that while he received ice at 3:00 p.m. from prison staff, he also wanted it in the morning because it was hot and he could not breathe. (ECF No. 19-4, at 29-31). Clark determined there was no medical indication for "medical ice." (*Id*.). On August 9, 2016, Robinson requested morning ice for pain from Peggy Mahler, N.P. (*Id*. at 33-36). A consult was placed for physical therapy. (*Id*.). On August 11, 2016, utilization review approved the physical therapy consult request during collegial review. (*Id*. at 37). On October 27, 2016, Robinson requested twice-daily ice from Krista Bilak, R.N.P. (*Id.* at 41-42). He was told there was no medical reason to provide ice. (*Id.*). On November 25, 2016, Robinson complained of neck pain to Mahboob Ashraf, M.D., who ordered ice. (*Id.* at 44-46). On December 19, 2016,

Robinson requested ice in the morning. Nurse McLaughlin noted that he had received a photocopy of an order for ice on December 16, 2016. (*Id.* at 52).

**Other Complaints**: Barrera also addresses Robinson's allegation that he had pneumonia in June, 2016, and received improper care, including use of a nebulizer and referral to an outside hospital. Robinson was appropriately diagnosed and treated for an upper respiratory infection, a condition for which treatment with a nebulizer and referral to a hospital were not medically indicated. Barerra also finds no indication in the medical records that R.N.P. McLaughlin ordered treatment with a nebulizer for the upper respiratory infection, and opines that it would be highly unusual and not recommended for a medical provider to issue verbal – rather than written -- orders to a prisoner giving daily access to the medical unit in order to use a nebulizer. Further, Barrera finds no recorded encounter between Robinson and Nurse Martin on June 30, 2016. (ECF No. 19-5 ¶¶ 8-11).

Barrera also notes that, for more than a decade, Robinson has argued that he needs a barium enema and surgery to remove a "blocked colon." Robinson's last barium enema, performed in 2004, showed multiple small diverticulae in the sigmoid and descending colon, with no mucosal abnormalities and no diverticulitis. A 2010 colonoscopy revealed mild left side diverticulosis[9] that did not warrant special treatment, and an abdominal CT scan in 2014 showed colonic diverticulosis without evidence of diverticulitis, and no indication of colitis. Barrera states that if Robinson really had a bowel obstruction, he would exhibit persistent severe abdominal cramping and vomiting, and significant weight loss. Dr. Barrera agrees with

---

[9] Diverticulosis occurs when small, bulging pouches (diverticula) develop in the digestive tract. When the pouches become inflamed or infected, the condition is called diverticulitis. *See* Mayo Clinic, *Diverticulosis and diverticulitis*, https://www.mayoclinic.org/diseases-conditions/diverticulitis/multimedia/diverticulosis-and-diverticulitis/img-20006098 (last viewed January 24, 2018).

9

Robinson that the provider who performed the 2010 colonoscopy recommended a repeat procedure in 5 years, but explains that this was merely a prophylactic recommendation and not an indication of a medically necessary procedure. Most significant, Dr. Barrera does not rule out a repeat colonoscopy if Robinson's symptoms dictate such a need. (ECF No. 19-5 ¶ 12).

Dr. Barrera also addresses Robinson's concerns that he is not treated for problems identified in a 2014 CT scan, stating that Robinson is regularly being seen by providers at chronic care clinics for his lung conditions, including asthma and COPD, and chronic pain. His asthma is generally stable, and while COPD is not curable and the damage it causes is not reversible, certain treatments, including use of a nebulizer, can provide temporary relief. Robinson is allowed to visit the medical department to use a nebulizer for his COPD symptoms, and he is prescribed pain medication for management of his musculoskeletal pain. An MRI of Robinson's neck in 2010 showed that his C2-C3, C3-C4, and C4-C5 discs were normal, he had a small central herniated nucleus pulposus with very minimal compression on the anterior cervical spinal cord at C5-C6, and his C6-C7 and C7-Tl discs were normal. The impression was a small diffuse central disc protrusion at C5-C6, a condition which indicated no medical need for referral to a specialist or surgical intervention. Barrera opines that Robinson misstates the findings of the 2014 CT scan, which were normal except for evidence of coronary artery disease, some evidence of elevation of the right hemidiaphram with mild atelectasis in the adjacent lung portion,[10] mild diffuse cortical thinning in the kidneys, mild degenerative changes in the lumbar spine, a small right inguinal hernia containing fat, and some filling of the right iliac venous system. The

---

[10] The hemidiaphragm is the muscle that separates the chest cavity from the abdomen. *See* MedicineNet.com, *Medical Definition of Elevated hemidiaphragm*, https://www.medicinenet.com/script/main/art.asp?articlekey=34232 (last reviewed January 24, 2018). Atelectasis involves deflation of part of a lung that may or may not cause breathing difficulty. *See* Mayo Clinic, *Atelectasis*, https://www.mayoclinic.org/diseases-conditions/atelectasis/symptoms-causes/syc-20369684 (last reviewed January 24, 2018).

impressions derived from these findings were colonic diverticulosis without evidence of diverticulitis, no indication of colitis, a right femoral arterial venous fistula, possibly from previous cardiac catheterization, mild renal atrophy, coronary disease, and a mild elevation of the right hemidiaphragm with mild atelectasis at the right lung base. Robinson will be monitored for these conditions, but they are not acute problems requiring immediate medical treatment, including operations. (ECF No. 19-5 ¶¶ 13-15).

Finally, Dr. Barrera explains the collegial review process. Generally, patients for whom specialty consultations are sought are placed on a list by the on-site primary medical providers for circulation to participants in the utilization review process. At a designated date and time for each correctional facility, primary medical providers tasked with presenting cases for review would participate in a conference call with a Wexford utilization review physician and utilization review nurse. During that conference call, the primary medical provider would identify the specialty care sought and provide information he or she deemed pertinent regarding the patient in support of that request for specialty care. Following presentation, disposition was rendered which typically fell into three categories including: 1) approval of care; 2) proposal of alternative treatment; or 3) a deferral of disposition on the basis that further clinical information was necessary to make a determination. Non-approval of specialty service as not medically indicated was also a disposition option. In the last year, three consultation requests for specialty care have been submitted on Robinson's behalf. One, for a GI consultation, was deemed not medically indicated and non-approved. The other two, for physical therapy and to evaluate his hearing aid for repair, were approved. (ECF No. 19-5 ¶ 16).

**Robinson's Response**: Robinson finds these medical services inadequate. In his opposition, Robinson avers that the design of his cell makes it impossible for him to blow a fan across ice to cool the air, (ECF No. 37-1, at 4), and that he needs ice to treat pain. (*Id.* at 5-6). He states that Martin "yell[ed] at [him] on June 30, 2016, saying 'you are not having heart failure, I can tell, you get out of here,'" then walked away when he was wheeled to the medical unit complaining of shortness of breath and chest pain and burning. (ECF No. 37, at 4-5). Robinson also states that his colon is "90% blocked" due to 'what they call diverticulosis.'" (*Id.* at 7). He complains that he has not been treated for right hip and shoulder injuries. (*Id.* at 15).

Robinson claims he did not receive a diagnostic colonoscopy in 2014, and medical records noting this occurred are false. (ECF No. 37-1, at 21-22). He includes an outline of Division of Correction Directives (DCDs) concerning equal medical treatment for all Maryland prisoners, as well as case citations and statutes in support of his Eighth Amendment claims. (*Id.* at 27-29). Robinson claims Barrera's statement that feed-in status was ordered due to incontinence issues is false, and that feed-in status was originally ordered by Dr. Mickel for "his right hip & right shoulder injury" that prevented Robinson from walking to the kitchen on his own. (*Id.* at 31). He also contends there is no ice machine in the housing tier; the machine in the lobby is frequently broken; and ice is delivered from the kitchen to the tier only at 2:30 p.m. and 8:30 p.m. (*Id.* at 34).

Robinson argues that "there is no such thing as a small disc protrusion," and that he suffers neck pain. (ECF No. 37-1, at 35). He states that his right lung x-rays are incomplete, that he has "right hemidiaphragm with stelectasis right lung base," that x-rays show a problem with "thinning" of the kidneys, and that he often uses an inhaler for lung issues. (*Id.* at 37-38).

12

**Conclusion Regarding Medical Care**: As this review of the records makes pellucid, Plaintiff has received consistent evaluation and treatment of his myriad medical problems without a hint of constitutionally inadequate medical care.

Robinson's Cross-Motion for Summary Judgment

Robinson states that Martin was fired from Wexford and thus is "guilty of all charges" raised in his complaint.[11] (ECF No. 52, at 1).[12] He complains, without specificity, that former Assistant Warden Gelsinger "interfer[ed] with inmate's medical issues," and that Dietary Manager Lance Harbaugh interfered with inmate's feed-in orders and provides "undercooked, cold" and stinking food on "wet, dirty" food trays.[13] (*Id.* at 2). Robinson believes that he did suffer pneumonia, and that tests, had they been ordered, would have shown this to be the case. (*Id.*). He states that Wexford employees often violated their own protocol by failing to automatically refer prisoners "to the next highest credentialed provider," causing delays in treatment (*id.* at 4), and infers that former Wexford Regional Health Service Administrator Janice Gilmore[14] permitted such practice in order to save money. (*Id.* at 3).

Robinson asks that a polygraph test be given to show Dr. Barrera has presented false evidence (*id.* at 6), as demonstrated by his own "affidavit" outlining medical care received

---

[11] The fact that Martin signed her name as well as Dr. Barrera's name on a medical record (ECF No. 52-1, at 2) does not, as Robinson suggests (ECF No. 52, at 3), denote wrongdoing.

[12] The pages of the electronic document ECF No. 52 do not match the page numbers as hand-written by Robinson. Where the two differ, this opinion cites to the page number when viewing ECF No. 52 electronically.

[13] The quality of food services at WCI is not at issue in this case, and will not be addressed here.

[14] Gilmore, not named a defendant here, is deceased. *See* http://scarpellifh.com/obituary/janice-lee-ferrens-gilmore/. No evidence supports Robinson's claim that Gilmore was involved in criminal activity.

between 1995 and 2009. (ECF No. 37-1, at 1-3). He seeks treatment in a Veterans Administration hospital, primarily to treat orthopedic problems relating to his neck, back, shoulder, arms, and hip. (ECF No. 52, at 7, 12). These problems, of course, are not the focus of his complaint, and will not be addressed in this lawsuit.[15] The cross-motion for summary judgment is denied.

**B.    Wexford**

Under § 1983, liability is imposed on any person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). Wexford, a corporation, may not be held liable for damages based on the assertions raised in the complaint.

**C.    Medical Negligence Claim**

To the extent that Robinson premised his complaint on allegations of negligence by Wexford personnel, such claim cannot proceed. The Maryland Health Care Malpractice Claims Act ("the Act"), Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq*., requires that all claims

---

[15] These problems were initially addressed in *Robinson v. Western Maryland Health System, Inc.,* DKC-10-3223, 2011 WL 2713462 (D.Md. July 8, 2011). On December 23, 2009, Robinson was examined by an orthopedic surgeon, who recommended an MRI of the cervical and lumbar spine which was performed on March 29, 2010. Studies showed mild degenerative joint disease at all levels, and degenerative disc disease with marked disc space narrowing in the lumbosacral area, together with a small central disc protrusion at the level of C5-6, with very minimal compression of the spinal cord, and at L3-4, and L5-S1, with no significant compression of the spinal cord. Neither surgery nor steroid injections was required for these conditions. *Id.* at *6.

14

against a health care provider for medical injury where monetary damages exceeding the limit of the concurrent jurisdiction of the District Court are sought must be submitted to the Health Care Alternative Dispute Resolution Office as a condition precedent to any judicial action. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.*, 73 Md.App. 1, 3 (1987); *Davison v. Sinai Hosp. of Balt. Inc.*, 462 F.Supp. 778, 779-81 (D.Md. 1978), *aff'd*, 617 F.2d 361 (4th Cir. 1980).[16] When assessing a claim for medical malpractice, a court is required to focus on "whether the claim is based on the rendering or failure to render health care and not on the label placed on the claim." *Brown v. Rabbit*, 300 Md. 171, 175 (1984). A court is required to dismiss an action for noncompliance with the Act where a party has failed to exhaust his or her administrative remedies under the Act. *See Roberts,* 73 Md.App. at 6; *see also Davison*, 462 F.Supp. at 781. As the proper standards of medical care are implicated here, Robinson's claims, to the extent they are construed as claims of negligence or medical malpractice, are subject to the Act's requirements. Because there is no showing that the Act's requirements were met, the claims cannot proceed.

**IV. Conclusion**

Robinson's medical needs have been assessed and the necessary treatment has been provided. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). There are no exceptional circumstances alleged in this case. For these reasons,

---

[16] An action within the concurrent jurisdiction of Maryland's district court is not subject to the provisions of this subtitle. Under Maryland law, in actions in contract or tort where the amount claims is at least $2,500 but below $5,000, the District Court of Maryland and Circuit Court have concurrent jurisdiction at the election of the plaintiff. *See Pollokoff v. Maryland Nat'l Bank*, 407 A.2d 799 (1979); Md. Code Ann., Cts & Jud. Proc. § 4-402(d).

Defendants' motion for summary judgment is granted, and Robinson's cross-motion for summary judgment is denied.

A separate Order follows.

February 1, 2018 /s/
DEBORAH K. CHASANOW
United States District Judge